# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:17-CR-336 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| DAUNTEZ D. BELL, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

The Superseding Indictment charges defendant Dauntez D. Bell with multiple drug-related offenses. (Doc. No. 29.) These charges stem from a federal investigation into a suspected drug trafficking organization ("DTO") involving defendant and other named, and unnamed, conspirators.

Bell has filed a series of pre-trial motions. The Court conducted a hearing on these motions on February 16, 2018, at the conclusion of which it took the motions under advisement. The Court is now prepared to issue its rulings. Specifically, the Court shall address herein: Bell's motion to suppress evidence derived from the extension of GPS monitoring (Doc. No. 27), Bell's motions to suppress evidence obtained from residential searches (Doc. No. 28), and Bell's

motion to suppress wiretap communications (Doc. No. 35).[1] The motions have been fully briefed.

## I. Bell's Motion to Suppress Evidence from Residential Searches

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. Const. amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quotation marks and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical conception that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier,* 423 F.3d at 531); *see United States v. Lazar*, 604 F.3d 230, 241-42 (6th Cir. 2010) (trial judge properly found probable cause in common-sense manner where affidavit was based on two-year involvement in the case, personal visits to locations, review of bills, and

---

[1] Bell also moved for leave to file additional motions (Doc. No. 25) and to compel the government to reveal the identity of various confidential sources (Doc. No. 26). Bell's motion to file additional motions was tied to his request to compel the government to produce unredacted copies of various affidavits and warrants. (*See* Doc. No. 24.) On January 22, 2018, the Court conducted a telephonic conference and announced the results of its *in camera* inspection of the unredacted documents. The Court advised that it was denying Bell's motion to compel with the proviso that the government remain cognizant of its obligations under *Brady*, *Giglio*, and the Jencks Act. (Minutes, dated 1-22-18.) Because this motion was dependent on defense counsel's review of the unredacted documents, the motion is denied as moot. Bell also sought the identity of three confidential informants identified in the July 14, 2017 warrant application. At the hearing on February 16, 2018, the government represented that it does not intend to call two of the three confidential informants at trial. As to the third, who is designated in the warrant application as "CSI," and whom Bell conceded at the hearing that he could already identify, the government agreed to reveal to Bell the informant's identity 14 days before the start of trial. Defense counsel agreed that this disclosure would give Bell sufficient time in which to prepare his defense, rendering the motion to reveal this individual's identity moot.

extensive interviews).

Bell seeks to suppress all evidence seized from three locations: (1) 26900 George Ziegler Drive ("Four Seasons") Apt. 213, (2) 23351 Chagrin Blvd. ("Deville North") Apt. 104, and (3) 23351 Chagrin Blvd. ("Deville North") Apt. 404, owing to what he perceives as deficiencies in the affidavit offered in support of the warrant.[2] Specifically, he maintains that the affidavit fails to establish the necessary "nexus" between the places to be searched and items sought therein. The government insists that the proper nexus has been established with respect to each location searched. In its opposition brief, the government also questioned Bell's standing to challenge any of the searches.

On July 14, 2017, a warrant application was submitted for the search of various locations, including the three referenced apartments. In support of the application, S.A. Sean O'Malley, an employee of the Department of Justice, Drug Enforcement Administration, offered an affidavit setting forth the basis for the requested warrants. (Doc. No. 28-1 ["Affidavit"], beginning at 167.) Following the issuance of the warrants, on July 14, 2017, the aforementioned locations were searched. The Deville North Apt. 104 search revealed clear plastic bags containing suspected marijuana, scales and blenders, cutting agents, respiratory masks, and a full body protective hazmat suit. The search of the Four Seasons Complex Apt. 213 yielded cell phones, two plastic bags containing suspected marijuana, large amounts of U.S. currency, and a red ledger suspected of recording drug activity. At the hearing, government counsel advised that the government does not intend to offer any evidence seized from Deville North Apt. 404 as part of

---

[2] Because the Court may not look beyond the four corners of the affidavits in evaluating Bell's motion to suppress evidence derived from the residential searches and his motion to suppress evidence from the extension of the GPS tracker warrant, *see United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010), the parties agreed at the hearing that live testimony from the agents was unnecessary.

its case-in-chief, thereby rendering consideration of this portion of the motion unnecessary.

The searches were supported by S.A. O'Malley's affidavit, totaling 61 pages. The Affidavit contained information derived from wiretaps, video surveillance, GPS tracking, field investigation, and confidential informants. The agent also drew from his considerable experience investigating drug trafficking organizations. The affiant explained that, generally, his experience and training had taught him that the search of the residences of drug dealers will likely yield evidence of their illicit enterprise. He also averred that drug dealers often attempt to conceal their identities, as well as the locations in which drug transactions occur and drugs and records are stored. According to S.A. O'Malley, drug traffickers often utilize multiple vehicles in their enterprises, and keep property, vehicles, and records in the names of others to conceal the association with these places and things with drug trafficking.

As to the specifics of the investigation, the affidavit provided that since 2012 the affiant and his colleagues had been investigating Bell's suspected drug trafficking activities. It further provides that, through the investigation, officers learned that Bell resided at Four Seasons Apt. 213, that he was receiving large quantities of heroin from a source in Chicago, and that he was using Deville North Apts. 104 and 404 to store drugs.

*Standing*

It is well settled that, as a threshold matter to invoking the exclusionary rule, a criminal defendant "bears the burden of showing that his *own* Fourth Amendment rights were violated." *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (citation omitted, emphasis added). To establish standing to challenge a government search, "[a] defendant must satisfy a two-prong

test to show a legitimate expectation of privacy: (1) he must manifest an actual, subjective expectation of privacy; and (2) that expectation is one that society is prepared to recognize as legitimate." *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000) (citing *United States v. Sangineto Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988)).

"The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents." *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) (citation omitted). The Sixth Circuit has, in certain circumstances, "even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence." *Id.* (citing *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005)). Moreover, the fact that the invited individual may use the space searched for criminal activities "does not alter the privacy expectations of a person who would otherwise have standing." *Id.* (citing *Minnesota v. Carter*, 526 U.S. 83, 91, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998)). However, someone who frequents a residence solely for business reasons, including illegal business activities, does not have an expectation of privacy. *See Carter,* 526 U.S. at 91 (individual who was in another's apartment for a few hours to process cocaine lacked standing to contest the search).

Bell relies exclusively on the averments in the supporting affidavit to establish his standing to challenge the searches of the apartments. The record shows that none of the properties are owned by Bell, nor is he listed on any of the leases. Nevertheless, the warrant affidavit provides that Bell is believed to "reside[]" in the Four Seasons Apt. 213, and that surveillance revealed that he had on many occasions kept cars in the parking space reserved for Apt. 213. (Affidavit ¶¶ 13, 38, 39, 48, 53.) Bell cites the unreported decision in *United States v.*

*Arzate*, No. 03-40026-01-SAC, 2003 WL 21667165, at *3 (D. Kan. June 16, 2003), to support his position that the government's averments, alone, may demonstrate a defendant's standing to challenge a search. Given that it is a part of the government's theory of the case that the Four Seasons apartment served as Bell's residence, and in the absence of case authority in the Sixth Circuit to the contrary, the Court will permit Bell to rely on the warrant application to establish standing as to that location. Moreover, at the hearing, the government's counsel conceded that Bell was living in Four Seasons Apt. 213 and thus had a reasonable expectation of privacy under the Fourth Amendment with respect to that dwelling.

In contrast to the Four Seasons apartment, the warrant affidavit does not establish Bell's standing to challenge the Deville North apartments. Bell points to the fact that the Affidavit provides that Bell was "in control of" Deville North Apt. 404. (Affidavit ¶ 16.) Beyond this reference, that same paragraph provides that Bell was believed to be using Apt. 404 "to store narcotics and/or narcotics proceeds." (*Id*.) Similarly, the Affidavit offered the opinion that Bell was using Deville North Apt. 104 "to store drugs and conduct drug-related meetings and transactions." (*Id*. ¶ 13.) The Affidavit does not offer any other possible uses for the apartments.[3] Had the Affidavit, for instance, averred that Bell lawfully resided or visited the property, the fact that the property was also used for criminal activity would not defeat his standing. *See Washington*, 573 F.3d at 283 (citing, among authority, *Carter*, 525 U.S. at 91). But Bell chose to

---

[3] Of course, an individual using a residence as a stash house would have control over the building, otherwise the dwelling would be vulnerable to discovery by the authorities.

rely entirely upon the Affidavit to demonstrate standing, and the Affidavit establishes, at best, that he used these apartments to store drugs. This is insufficient to establish standing. *See e.g., United States v. Gray*, 491 F.3d 138, 153 (4th Cir. 2007) (no reasonable expectation of privacy in co-defendant's apartment because defendant was a business guest and used apartment to traffic drugs); *United States v. Trammell*, 52 F. App'x 661, 664 (6th Cir. 2002) (co-defendant did not have standing where he had never been an overnight guest, kept clothes there, or done anything on the premises "other than pursue his drug-trafficking career"). Bell lacks standing to challenge the searches of Deville North Apts. 104 and 404.

*Nexus*

Bell challenges the sufficiency of the Affidavit on the ground that it failed to establish the necessary nexus between the places to be searched and the items to be seized. "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)); *see Fraizer*, 423 F.3d at 531 ("To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search.") (quotation marks and citation omitted).

The Affidavit plainly established a sufficient nexus between the targeted evidence and the Four Seasons Apt. 213. Independent police surveillance and other investigatory techniques demonstrated probable cause to believe that Bell was involved in a large scale ongoing drug trafficking operation. Specifically, the Affidavit demonstrated that Bell was receiving shipments

of large quantities of drugs from a source in Chicago. (Affidavit ¶ 14.) The interception of subsequent cellular calls between Bell and an individual from Chicago, who relocated to the Cleveland area during the course of the investigation, and surveillance that captured receipt of a drug shipment by Bell, confirmed that Bell was receiving drug shipments through this individual. (*Id*. ¶¶ 14, 15, 128-29.) Hundreds of other intercepted calls between Bell, his supplier, and suspected co-conspirators demonstrated that Bell was involved in ongoing drug trafficking. (*Id*. ¶¶ 9, 17, 23.) Through the use of confidential informants and surveillance of Bell, federal agents were also able to record at least three controlled drug transactions involving Bell. (*Id*. ¶¶ 27-36, 52-74, 88-98.) Specifically, with respect to Four Seasons Apt. 213, the Affidavit recounted how surveillance observed Bell departing and/or returning to the apartment after receiving large shipments of drugs, after controlled purchases, or after engaging in cellular phone conversations making arrangements to participate in drug transactions. (*See, e.g., id*. 53, 107-111.) The Affidavit further indicated that Bell parked vehicles utilized by him in drug transactions in front of the Four Seasons apartment. (*Id*. ¶¶ 48-49.)

Additionally, the use of multiple residences (including the Four Seasons apartment believed to be his home) and vehicles not registered in Bell's name, and the deployment of counter-surveillance techniques designed to identify possible law enforcement surveillance, were consistent with Bell's current involvement in drug trafficking activity. (*See, e.g., id*. ¶¶ 1, 113.) Finally, the Affidavit advised that Bell had been convicted of drug possession and trafficking on previous occasions.

As set forth above, the government believed that Bell resided in Apt. 213. S.A. O'Malley explained in his Affidavit that, generally, his experience and training in investigating drug

trafficking activity has taught him that the search of the residences of drug dealers will yield evidence of drug trafficking, including currency, financial instruments, jewelry, safety deposit boxes, and drug proceeds. (Affidavit ¶¶ 2-5.) This evidence, alone, is sufficient under Sixth Circuit law to establish a nexus to search the residence. "[A]n issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Penney*, 576 F.3d 297, 311 (6th Cir. 2009) (quotation marks and citation omitted); s*ee United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000). Here the Affidavit relates evidence of continuing drug trafficking activity by Bell, from which the issuing judge could infer that evidence of such illegal activity would be found at Bell's residence. *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (collecting cases).

Bell suggests, however, that the Sixth Circuit's recent decision in *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016), changed the legal landscape with respect to searches of the residences of known drug dealers. In *Brown*, the Sixth Circuit recognized that it "ha[s] permitted judges to infer a fair probability of finding evidence in a residence even though the affidavit did not state that such evidence had been observed directly." *Id*. at 383 (citations omitted). The court reiterated, though, that it has never held that "a suspect's status as a drug dealer, *standing alone*, gives rise to a fair probability that drugs will be found in his home." *Id*. (quotation marks and citation omitted, emphasis added). "Rather, [the court] ha[s] required some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, [the Sixth Circuit] ha[s] required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id*. (comparing cases). Alternatively, the court observed that it has "found the nexus sufficient even

though the affidavit did not contain facts showing that the residence has been used in drug trafficking" when "the affidavit[] did not just establish that the defendant[] w[as a] drug dealer[], but contained overwhelming evidence that the defendant[] w[as a] major player[] in a large, ongoing drug trafficking operation." *Id.* at 393 n.2 (citation omitted). The Court find that, under either theory, the affidavit sufficiently established the nexus necessary to search Bell's suspected residence.

Unlike the situation in *Brown*, the affidavit presented to the issuing judge was supported by credible evidence tying Bell's ongoing drug trafficking to the Four Seasons apartment. Evidence that Bell was observed by law enforcement leaving from and returning to the apartment after suspected drug transactions, as well as evidence that Bell received and made drug-related cellular calls from that residence, provide a direct link between Bell's alleged drug trafficking and that apartment. It is also notable that, though Apt. 213 was believed to be Bell's residence, it—like the other residences utilized by Bell—was not leased to him. S.A. O'Malley averred that his experience and training taught him that those engaged in drug trafficking conceal their residences, and the issuing magistrate judge had the right to rely on this as well in finding a nexus between the apartment and the items sought in the warrant.

Even without these direct ties, the agent's affidavit contains overwhelming evidence that Bell was a major player in a large, ongoing drug trafficking operation. Far from relying on Bell's mere *status* as a drug dealer, the Affidavit established, through direct surveillance and other investigatory methods, that Bell worked with a co-conspirator to receive shipments of large quantities of drugs from Chicago, he utilized numerous residences (including stash houses) and vehicles (often registered to others) to facilitate his operation, he participated in hundreds of

cellular conversations with a variety of conspirators wherein drug transactions were discussed and planned, and he personally participated in numerous drug sales. Given all of this evidence, there was more than sufficient information in the Affidavit to allow a neutral magistrate to conclude that there was a "fair probability" that evidence involving illegal drug activity would be found at Bell's residence. Accordingly, based upon the "totality of the circumstances," the Court finds that the Affidavit supplied the necessary nexus between Four Seasons Apt. 213 and the evidence sought by law enforcement.[4]

*Good Faith*

Even if the Affidavit and warrant were fatally defective, the search would still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quotation marks and citation omitted). The "good-faith inquiry is confined to the objectively ascertainable question of whether a reasonably

---

[4] Even though Bell lacked standing to challenge the searches of the Deville North apartments, the Court finds that the supporting Affidavit also established the nexus necessary to justify a search of these residences for evidence of drugs and drug trafficking. As previously mentioned, the Affidavit set forth that Bell was using these apartments as stash houses, which is a common practice amongst drug dealers. (Affidavit ¶¶ 1, 13, 16.) For example, the Affidavit cites a telephone call between Bell and CS-1 wherein Bell gives CS-1 instructions to travel to the Deville North apartments to participate in a drug transaction and CS-1 ultimately enters Apt. 104 in an attempt to facilitate the sale. (*Id.* ¶¶ 91-98.) The Affidavit also recounts an intercepted call wherein Bell discussed with an unknown female that he had received a complaint letter from the Deville North apartments about suspected illegal drug activity in Apt. 104. (*Id.* ¶ 87.) Moreover, at least one of the controlled buys involving Bell occurred in the parking lot of a building "immediately adjacent to the Deville Apartments," after which Bell was observed returning to the Deville North apartments. The Affidavit further provides that investigators had previously observed Bell engage in other suspected drug transactions at this location. (*Id.* ¶¶ 66-74.) These averments were more than sufficient to demonstrate a "fair probability" that evidence of drug activity would be found at these residences.

well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances … may be considered." *Leon*, 468 U.S. at 922-23 n.23.

The good-faith defense will not apply, however, where: (1) the supporting affidavit contains information the affiant knew or should have known is false, (2) the issuing magistrate lacked neutrality and detachment, (3) the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely unreasonable, or (4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (citation omitted).

None of the exceptions to the good faith rule in *Leon* apply. Bell has not alleged that the affiant knowingly relied upon false information or that he acted in bad faith, there is no evidence that the issuing magistrate judge was not neutral, the affidavit was not "bare bones," and the affidavit is not facially deficient.[5]

Moreover, given the obvious effort exhibited by the applying agent to comply with the requirements of the Fourth Amendment (including the level of detail and the care given to tie Bell to the properties to be searched and the drug activity under investigation), coupled with the fact that the application was granted by a detached and neutral magistrate, the Court finds that, even if the search were illegal (which it was not), a reasonably well trained officer would not have known that it was illegal. *See, e.g., United States v. Stelten*, 867 F.2d 446, 451 (8th Cir. 1989) (good faith exception applied where agents "took much care in drafting the descriptions of

---

[5] In *Brown*, the Sixth Circuit found that the government was not entitled to *Leon's* good faith defense because "[s]ave for a passing reference to Brown's car registration, the affidavit [was] devoid of facts connecting the residence to the alleged drug dealing activity." *Brown*, 828 F.3d at 385.

items to be seized"); *United Sates v. Buck*, 813 F.2d 588, 593 (2d Cir. 1987) (good faith exception applied where officers provided details outlining the crimes and the evidence sought to a neutral magistrate).

## II. Bell's Motion to Suppress Evidence from GPS Monitoring

Bell also challenges the issuance of an extension of GPS monitoring on a Jeep Grand Cherokee believed to be owned by Bell. The search warrant was issued on March 14, 2017, and, on April 28, 2017, federal agents applied for an extension of the monitoring. Bell does not challenge the initial tracking warrant; he only challenges the reissuance of the warrant. The extension application was supported by a 34 page affidavit by S.A. Daniel Lajack. (Doc. No. 27-1 ["GPS Affidavit"].) In the GPS Affidavit, S.A. Lajack reviews his considerable experience investigating DTOs, and explained that he had been a part of the law enforcement team that had been investigating Bell's drug trafficking activity since 2012. (*Id*. ¶¶ 1-5.)

The government does not challenge Bell's standing to challenge the GPS tracker warrant, as the vehicle was registered to him. Nonetheless, the Court observes that Bell's motion is largely academic because it is unlikely that any evidence offered at trial was discovered as a result of the monitoring of the Jeep Grand Cherokee. In fact, the only information regarding the monitoring of the Jeep Grand Cherokee utilized by agents in the Affidavit supporting the warrants for the searches of the apartments came during the initial 45 day monitoring

period.[6] Nonetheless, in an abundance of caution, the Court shall consider Bell's motion on the merits.

In *United States v. Jones*, 565 U.S. 400, 404, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012), the Supreme Court recognized that the "government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search." Bell contends that the extension of the tracking warrant was constitutionally infirm. He complains that there was no information presented that drug activity took place from the vehicle during the time of the initial monitoring and, that the vehicle was actually in the repair shop when the extension was sought. As such, he posits, that the warrant issued on the representation that it was believed that the vehicle would be used in the future to facilitate drug trafficking, once repairs were made, and argues that such speculation does not permit independent review by a magistrate.

---

[6] In fact, the government argues that "all items and evidence seized during this case would have been found without any information gleaned from DEA monitoring [Bell] while he used the Jeep." (Doc. No. 30 at 253.) The inevitable discovery exception to the exclusionary rule provides that a court may admit illegally obtained evidence if the evidence would inevitably have been discovered through independent, lawful means. *See United States v. Alexander*, 540 F.3d 494, 502-03 (6th Cir. 2008) (evidence admissible despite illegal treatment of defendant because evidence would have been discovered properly based on investigation and search warrant) (citations omitted). This doctrine applies where "the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (emphasis in original) (citation omitted).

According to the government, the facts demonstrate that agents had other evidence that tied Bell to drug trafficking and the apartments searched. Specifically, it notes that, before the Jeep tracking began, agents observed Bell participate in three controlled purchases. They also surveilled Bell in his Toyota and witnessed what they believed was his receipt of a shipment of cocaine. This evidence, the government contends, demonstrates that the Jeep GPS tracking was not independently material to the investigation. This argument really seems more akin to the related independent source doctrine. *See Murray v. United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) (inevitable discovery is extrapolation from the independent source doctrine; because tainted evidence would be admissible if discovered through an independent source, it should be admitted if it would inevitably have been discovered); *see, e.g., United States v. Song Ja Cha*, 597 F.3d 995, 1003 (9th Cir. 2010) (evidence admissible because police had independent, existing warrant based on probable cause from corroborated witnesses prior to unreasonable search and seizure); *United States v. Dessesaure*, 429 F.3d 359, 369-70 (1st Cir. 2005) (evidence admissible because search warrant was obtained on basis of facts gathered legally prior to illegal search). Under either theory, the Court finds that any evidence that was tied to the extension of the GPS tracking warrant—to the extent that there actually was any—would be admissible.

Bell's position is not entirely accurate. Indeed, the GPS Affidavit does set forth a suspected drug transaction occurring during the initial 45 day monitoring period involving Bell's use of the Jeep Grand Cherokee. (GPS Affidavit ¶¶ 35-42.)[7] The GPS Affidavit also provided that, during the course of the investigation wherein officers observed multiple drug transactions involving Bell, Bell drove three different vehicles, including the Jeep Grand Cherokee, and that he utilizes all three vehicles in his "day to day activities in the illegal drug trade in an effort to deter law enforcement from surveying him and his activities." (*Id*. ¶ 76.) Moreover, at the hearing, Bell's counsel conceded that there was nothing false or misleading in the GPS Affidavit, and that it accurately represented that the vehicle was in the body shop at the time the warrant extension was sought. (*Id*. ¶ 74.)

Based upon the frank and truthful information in the GPS Affidavit, it was not unreasonable for the issuing magistrate judge to find that it was possible that the Jeep Grand Cherokee would be utilized again by Bell during the next 45 days, once the body damage was repaired. In fact, the GPS Affidavit provided that Bell used the Jeep Grand Cherokee in the aforementioned suspected drug transaction because one of the other vehicles—the Toyota Tundra—was parked at a tire shop, demonstrating that Bell had a practice of switching vehicles when necessary to facilitate maintenance or repairs. (*Id*. ¶ 28.)

Additionally, the fact that the vehicle was in the shop for repairs explains why there

---

[7] While the GPS Affidavit candidly indicates that no drugs were recovered, it also identifies facts demonstrating that the interaction between Bell and occupants of another vehicle had all of the hallmarks of a drug transaction.

wasn't more activity involving the vehicle during the initial period that the warrant was in force. Thus, if there was a sufficient basis to issue the initial tracking warrant—which Bell does not challenge—then it makes sense that the neutral magistrate could consider the totality of the evidence relating to Bell and his use of vehicles, including that the Jeep Grand Cherokee was unable to be used for a time due to repairs when reauthorizing the tracking.

Ultimately, the Court finds that the evidence summarized by S.A. Lajack in the GPS Affidavit provided sufficient probable cause to believe that Bell used his Jeep Grand Cherokee in the past to further his drug trafficking activities, and was likely to use it again, and that evidence of such crimes would be obtained by tracking the vehicle's movements. This same evidence would also have satisfied the less demanding *Leon* good faith standard, and as the GPS Affidavit was not "bare bones," issued by a non-neutral magistrate, or based on false or misleading information, the exceptions to *Leon* would not prevent the Court from upholding the warrant on this ground as well. Bell's motion to suppress evidence from the GPS tracking warrant extension is denied.

### III. Bell's Motion to Suppress Title III Wiretap

In his final motion, Bell challenges the Title III warrant signed by Judge James S. Gwin on June 14, 2017, alleging that the FBI failed to properly minimize certain intercepted calls. Title III requires the government to conduct electronic surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception[.]" 18 U.S.C. § 2518(5). To assess minimization efforts, the Court conducts "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Scott v. United States*, 436 U.S. 128, 136, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978); *see United States v. Feldman*, 606 F.2d

673, 678 (6th Cir. 1979) ("[t]he (minimization) statute is deemed to be satisfied if 'on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion'") (citation omitted). Title III "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott*, 436 U.S. at 140. The government's minimization efforts need not be perfect; instead, the monitoring agents' actions need only be "reasonable." *Scott*, 436 U.S. at 137-40; *see Feldman*, 606 F.2d at 678.

Initially, the government must make a *prima facie* showing of reasonable minimization. *See United States v. Yarbrough,* 527 F.3d 1092, 1098 (10th Cir. 2008) (citing *United States v. Willis,* 890 F.2d 1099, 1102 (10th Cir. 1989)); *United States v. Gray*, 372 F. Supp. 2d 1025, 1042 (N.D. Ohio 2005), *aff'd,* 521 F.3d 514 (6th Cir. 2008). "Then, the burden shifts to the defendant to show that more effective minimization was possible." *Gray*, 372 F. Supp. 2d at 1042 (citing *Willis*, 890 F.2d at 1102). As to the defendant's burden, "it is not enough to identify particular calls which [he] contend[s] should not have been intercepted; [he] must establish a pattern of interception of innocent conversations which developed over the period of the wiretap."[8] *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985) (quotation marks and citations omitted). If

---

[8] At the motion hearing, defense counsel suggested that his client did not bear the burden of demonstrating a pattern of capturing innocent conversations when the government has established a *prima face* case of reasonable minimization efforts. In support, he cited a Fifth Circuit case wherein the court relied on the failure to adequately minimize one call as evidence that minimization efforts were constitutionally deficient. The case is easily distinguished. In *United States v. North*, 735 F.3d 212, 216 (5th Cir. 2013), the Fifth Circuit held that the government's failure to minimize a *50 minute* phone call was objectively unreasonable where the "conversation did not turn to criminal matters until the last few minutes." None of the calls identified by Bell rise to the level of the egregiousness involved in listening for nearly an hour to a non-pertinent call with little or no minimization. Rather, the law remains clear that Bell was obligated to come forward with evidence of a pattern of interception of innocent conversations without proper minimization over the life of the wiretap, something he has failed to do. *See United States v. Jenkins*, 659 F. App'x 327, 336 (6th Cir. 2016) (quoting *Lawson, infra*).

the defendant fails to meet this burden, the Court will deny the motion to suppress, "even if the defendant has identified isolated instances where the [g]overnment failed to minimize non-pertinent conversations." *Gray*, 372 F. Supp. 2d at 1042-43 (citing *United States v. Armocida*, 515 F.2d 29, 45 (3rd Cir. 1975)).

In applying the reasonableness standard articulated in *Scott*, courts look to a variety of factors including: "the nature and scope of the criminal investigation; the [g]overnment's reasonable expectations of the character of conversations; and, the extent of judicial supervision over the surveillance." *Feldman*, 606 F.2d at 678 (collecting cases); *see United States v. Uribe*, 890 F.2d 554, 557 (1st Cir. 1989). Courts may also consider the "point during the authorized period the interception was made[,]" *Scott*, 436 U.S. at 141; *see United States v. Parks*, No. 95 CR 510, 1997 WL 136761, at *13 (N.D. Ill. Mar. 24, 1997), as well as the government's internal monitoring of minimization. *Parks*, 1997 WL 136761, at *14 (citing *United States v. Dorfman*, 542 F. Supp. 345, 391 (N.D. Ill. 1982)).

With respect to the nature and scope of the criminal investigation, "when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more conversations will be permissibly interceptible because they will involve one or more of the co-conspirators." *Scott*, 436 U.S. at 140; *see United States v. Adams*, 759 F.2d 1099, 1115 (3d Cir. 1985); *Parks,* 1997 WL 136761, at *12 ("The fact that this investigation was directed against a broad conspiracy eases the government's minimization burden.") The investigation further increases in complexity where the target interceptees intermingle conversations about legitimate business with those about corrupt business or illegal

activity, *see United States v. Abscal*, 564 F.2d 821, 827 (9th Cir. 1977) ("The conversing conspirators frequently discussed non-narcotic-related matters at the beginnings of conversations […]."), or when the participants use ambiguous or coded language. *See United States v. Bennett,* 219 F.3d 1117, 1124 (9th Cir. 2000) (recognizing that with "guarded or coded language ... , a higher rate of nonrelevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call") (citation omitted); *Abscal*, 564 F.2d at 827.

*Standing*

As an initial matter, the government argues that Bell may lack standing to challenge the Title III warrant. A person's status as an "aggrieved person" under the statute does not confer upon them standing to challenge minimization. *See United States v. Fury*, 554 F.2d 522, 526 (2nd Cir. 1977); *United States v. Moore*, 811 F. Supp. 112, 118 (W.D.N.Y. 1992). Numerous courts have held that "even defendants who are named as targets of the investigation may lack standing to challenge law enforcement's minimization techniques if they did not have an expectation of privacy in the residence in which the tapped phone was located." *United States v. Castillo-Martinez*, No. 04-CR-6128L, 2007 WL 1026363, at *5 (W.D.N.Y. Apr. 2, 2007) (named target did not have an expectation of privacy in phone owned by another) (citing *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2nd Cir. 1991)); *see United States v. Gallo,* 863 F.2d 185, 192 (2nd Cir. 1988); *United States v. Vasconcellos*, 658 F. Supp. 2d 366, 382 (N.D.N.Y 2009); *Moore*, 811 F. Supp. at 118.

Other courts have drawn slightly different lines, finding that a defendant "has standing to challenge minimization if the government 'overheard conversations of [the person] himself *or*

conversations occurring on his premises, whether or not he was present or participated in those conversations.'" *Parks*, 1997 WL 136761, at *11 (quoting *Alderman v. United States*, 394 U.S. 165, 176, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969) (emphasis added)); *see United States v. Mavroules*, 813 F. Supp. 115, 117 (D. Mass. 1993) (defendant lacked standing where he did not contend that the tap was either "an unlawfully overheard conversation of … himself or conversations occurring on his premise") (quotation marks and citation omitted); *United States v. Suquet*, 547 F. Supp. 1034, 1038 (N.D. Ill. 1982) ("[W]hen objecting to the introduction of a given call X, a defendant must show that he or she was a party to call X or that he or she has a privacy interest in the premises housing the tapped phone.") (citing *Alderman*, 394 U.S. at 176).

This Court in *United States v. McCafferty*, 772 F. Supp. 2d 863, 870 (N.D. Ohio 2011) limited standing to those calls in which the defendant was either a participant or which occurred on his premises, and courts continue to draw this distinction. *See, e.g., United States v. Azano Matsura*, 129 F. Supp. 3d 975, 979 (S.D. Cal. 2015). Accordingly, the Court finds that Bell has standing to challenge those calls where he was either a participant or which occurred on his premises.


*Bell's Claims of Minimization*

Bell claims that the government failed to adequately minimize the calls that were captured during the Title III wiretap. The wiretap intercepted 329 calls and 91 text messages. Only 238 of the 329 calls were completed with full audio. Of those calls, 120 were marked as pertinent to the investigation and 6 were minimized. The government notes that its investigation revealed that Bell used this phone line in particular, which is why so many calls were marked as

pertinent.

With respect to their initial burden, the government relies on a number of factors in justifying its minimization efforts, such as the fact that these calls were intercepted during a wide-spread drug conspiracy where the co-conspirators were employing code, the agents were given a clear and thorough minimization memorandum outlining minimization duties, and the investigation was court-supervised with progress reports provided. (*See* Doc. No. 36-1 ["Memo"].) The government also notes that the wiretap at issue covered the first 30 days of the investigation, when officers were still learning the nature of the drug conspiracy, the relationship between the parties, and their practices with respect to their drug trafficking activities.[9]

The Court finds that the government has met its burden of demonstrating a *prima facie* case of reasonable minimization. The burden now shifts to Bell to show a pattern of intercepting non-pertinent conversations. Bell has not met this burden.

There were approximately 67 calls that were identified as "non-pertinent," in that no criminal activity was discussed. Bell has identified 9 calls that he believes were inadequately minimized. The Court has listened to the audio recordings of these calls and makes the following determinations: Two of the calls were approximately two minutes or less (6/24/17—duration 1:44; 6/28/17—duration 2:08). One involved a brief discussion between Bell and an unidentified female child, and the other involved Bell's discussion with a female adult regarding dinner plans. Both calls were clearly personal, but courts agree that minimization is generally inapplicable to calls of less than two minutes in duration because they are "too brief a period for an

---

[9] Agents did not seek to renew the Title III warrant because they had reason to believe that Bell had become aware of the GPS trackers placed on his vehicles and, therefore, knew that he was under surveillance. At that point, agents made the decision to terminate the wire and close down that portion of the investigation. Bell was arrested on July 14, 2017, three days before the expiration of the original Title III wiretap warrant.

eavesdropper even with experience to identify the caller and characterize the conversation[.]" *United States v. Capra*, 501 F.2d 267, 275-76 (2d Cir. 1974) (quotation marks and citation omitted); *see Gray*, 372 F. Supp. 2d at 1045 ("monitoring during the first two or three minutes to determine the relevance of the call satisfies the minimization requirement") (citation omitted).

Two of the identified calls were actually pertinent to the investigation (6/19/17—duration 5:17; 6/29/17—duration 3:43). The first call occurred within days of the institution of the wiretap and involved Bell and another man having what was clearly a coded conversation. In the second call, an unidentified woman lamented to Bell about the fact that she did not have a car. Given the fact that agents were aware that Bell often arranged for vehicles to be leased in other people's names, it was appropriate for agents to continue to monitor this call, as well.

Two more calls were placed by inmates to Bell from jail (7-1-17—duration 4:21; 7-3-17—duration 11:52). In both calls, an automated voice can clearly be heard advising that all jail house calls may be monitored. Notwithstanding this warning, the first call was minimized once Bell and an unidentified female began speaking about a birthday party. The second call never discussed criminal matters and was clearly personal in nature. Still, at the beginning of the wiretap, agents had reason to be suspicious of calls received from inmates, as they were still attempting to identify the various drug conspirators, making the surveillance warranted. Moreover, even if these calls should have been more thoroughly minimized, the Court finds that, given the automated warning, there was no expectation of privacy as to either call.

Of the remaining calls, several involved vague discussions about vehicles, trying to locate people in vehicles for unclear reasons, and service on a vehicle (6/21/17—duration 3:57; 6/28/17—duration 3:05; 7-8-17—duration 7:03). At least two of the calls mentioned a Toyota,

which featured prominently in several of the aforementioned affidavits. Given the use of multiple vehicles in this DTO to conduct drug transactions, the Court finds that it was proper for the agents to continue to monitor these calls. The third call, occurring on July 8, 2017, involved an unknown female motorist who, according to Bell, had purportedly borrowed his phone to call for roadside aside assistance. While this is not entirely clear from the recording, the Court will credit Bell's account of this call and find that this call should have been minimized. That said, given Bell's use of multiple vehicles, some of which were titled in other's names, some monitoring of the call was appropriate.

Of the remaining three calls, the call occurring on June 30, 2017 begins with an unknown male informing Bell that he "got your s*** in the car with me." During the conversation, the two discussed several people. Bell is also overheard answering and talking on another phone. Because this call occurred early in the interception period, started with ambiguous or coded language, and discussed a variety of people, it was reasonable for monitoring agents not to minimize the call. *See, e.g., United States v. Dimora*, 836 F. Supp. 2d 534, 580 (N.D. Ohio 2011) (conspirators' habit of putting people on hold while attending to other matters presented additional difficulties for monitoring agents).

The last two calls, both exceeding 2 minutes, involved entirely personal matters and should have been minimized, making three calls that were improperly minimized. At best, Bell has identified isolated instances when minimization efforts fell short. These three calls—or roughly 4% of all non-pertinent calls—do not establish a pattern of improper minimization. Bell has failed to demonstrate that "the monitoring agents exhibited a high disregard" for his privacy rights or that the agents "did not do all they reasonably could to avoid unnecessary intrusions."

*United States v. Patel*, 579 F. App'x 449 (6th Cir. 2014) (quoting *Feldman*, 606 F.2d at 679).

Because Bell has failed to meet his burden of demonstrating that the government's minimization efforts were unreasonable, his motion to suppress the wiretap evidence on minimization grounds is denied.[10]

### IV. CONCLUSION

For all of the foregoing reasons, Bell's motions to suppress (Doc. Nos. 27, 28, 35) are **DENIED**.

**IT IS SO ORDERED**.

Dated: March 6, 2018

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[10] Of course, even if Bell had established a pattern of failing to minimize calls, the remedy would not have been, as Bell suggests, the suppression of all intercepted calls. Rather, the suppression of only the non-pertinent calls that were improperly minimized would be appropriate. *See United States v. Baltas*, 236 F.3d 27, 32 (1st Cir. 2001) ("[E]rrors in minimizing one particular interception within the context of a lengty and complex investigation . . . do not automatically warrant suppression of all the evidence."); *Gray*, 372 F. Supp. 2d at 1046; *see, e.g., United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (district court properly suppressed only the call that violated the minimization order, and not the entire wiretap, where no evidence that entire investigation was tainted); *United States v. West*, No. 06-20185, 2009 WL 4506420, at *1 (E.D. Mich. Nov. 30, 2009) ("suppression of all wiretap evidence is only appropriate when the failure to minimize is egregious"). In the absence of egregious conduct, suppression of all intercepted calls would not have been appropriate.